THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
March 21, 2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re HSB Solomon Associates, LLC

_____

Serial No. 77136242

_____

Dwayne L. Mason and A. Alex Nowamooz of Greenberg Traurig, LLP for HSB Solomon Associates, LLC.

Jason Paul Blair, Trademark Examining Attorney, Law Office 104 (Chris Doninger, Managing Attorney).

_____

Before Kuhlke, Ritchie and Shaw, Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

On March 21, 2007, HSB Solomon Associates, LLC, applicant, filed application Serial No. 77136242 to register CEI as a mark in standard characters on the Principal Register for services ultimately identified as "technical consultation in the field of hydrocarbon and chemical processing, pipeline, and power industries" in International Class 42. The application was originally filed under Section 1(a), 15 U.S.C. §1051(a), alleging

April 2005 as the date of first use and first use in commerce. On November 9, 2007, in response to a specimen refusal issued by the examining attorney, applicant amended the basis to Section 1(b) of the Trademark Act, 15 U.S.C. §1051(b), alleging a *bona fide* intention to use the mark in commerce. Thereafter, the USPTO published the application for opposition and issued a notice of allowance; and applicant filed a Statement of Use.

The examining attorney made final a refusal of registration under Sections 1 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1127, on the ground that the specimens filed in support of applicant's Statement of Use fail to show use of the mark for the services identified in the application. After receiving both applicant's notice of appeal and request for reconsideration the Board remanded the application to the examining attorney for consideration of the latter. Following denial of the request, the appeal was resumed.

The appeal has been fully briefed. We affirm the refusal to register.

Section 1 of the Trademark Act requires that the subject matter presented for registration be a trademark or service mark. Section 45 defines a service mark as "any word ... used ... to identify and distinguish the services

of one person ...." 15 U.S.C. § 1127. Thus, subject matter that, due to its inherent nature or the manner in which it is used, does not function as a mark to identify and distinguish the applicant's applied-for services cannot be registered. A term that identifies only a process, style, method or system is not registrable as a service mark. Trademark Manual of Examining Procedure (TMEP) §1301.02(e) (8th ed. 2011); and In re Universal Oil Products Co., 476 F.2d 653, 177 USPQ 456 (CCPA 1973). See also In re Osmotica Holdings Corp., 95 USPQ2d 1666 (TTAB 2010) (OSMODEX only refers to drug delivery technology not the consulting services); In re DSM Pharmaceuticals, Inc., 87 USPQ2d 1623 (TTAB 2008) (LIQUIDADVANTAGE only refers to software and does not identify and distinguish the custom manufacturing services); In re Moody's Investor's Service Inc., 13 USPQ2d 2043 (TTAB 1989) (ratings symbols do not identify and distinguish rating services); and In re Hughes Aircraft Co., 222 USPQ 263 (TTAB 1984) (PHOTOX only refers to deposition process and has no direct association with applicant's treatment services).

In support of its referenced Statement of Use, applicant submitted its brochure as its specimen of use, and pertinent excerpts are reproduced below:

3

**Abstract**

HSB Solomon Associates LLC's (Solomon's) benchmarking methodology for measuring greenhouse gas (GHG) emissions performance for fuel and lube refineries uses a patent-pending equivalency factor (Carbon Emissions Index—CEI™) to enable performance comparison among all types of petroleum refineries. CEI is more robust than other publicly available performance metrics and provides a more accurate description of GHG intensity by incorporating refinery complexity into this new metric. As a result, CEI permits refineries to develop realistic emission reduction targets and provides a consistent basis for monitoring performance improvement.

## Carbon Emission Intensity for Petroleum Fuels Refineries

The *Energy Performance Benchmarking* section summarizes the methodology used to determine EII for each refinery participating in our studies. Recall that for EII, we calculate an energy standard for each refinery, taking into account its particular process configuration, feedstock characteristics, operating rates, and operating conditions. For GHG, we adopt an analogous approach, but rather than using the energy standard, we have developed a methodology to calculate a GHG emission standard. The CEI standard for emissions performance has five components:

- *Direct $CO_2$* (from FCC Catalyst Regeneration) – This component of the CEI standard is derived from an energy model supplied by coke combustion in FCC catalyst regeneration. The model

the other. There are many instances where a refinery's ranking on the CEI curve is significantly different from its EII ranking, as shown by the examples in Figure 8. Refinery 1 is mediocre in energy efficiency, but is top of the second quartile in CEI. Why? This

unrelated to energy performance. Clearly, if it is important to benchmark GHG emission performance in particular, the CEI metric is superior.

a proxy for GHG performance. CEI, as described in this paper, addresses these problems and can serve as a reliable GHG emission performance measure. CEI can also be readily adapted for other energy-intensive industries. We have already

In addition, applicant submitted substitute specimens with its referenced Request for Reconsideration. The portions highlighted by applicant are reproduced below.

4

## Greenhouse Gas

Giving you an in-depth understanding of all aspects of managing carbon dioxide equivalent ($CO_2e$) emissions, our greenhouse gas (GHG) consulting practice can help you meet your regulatory obligations while highlighting areas where improved $CO_2e$ emissions efficiency is possible. The path to effectively managing your facility's GHG emissions begins with an assessment of your performance relative to industry using credible metrics.

**Solomon's GHG Consulting Process**

We start by understanding your specific GHG business objectives and goals.

Based on your needs, we tailor our analyses and deliverables to align with your expectations.

To identify areas of opportunity, we first compare your performance to the "world best" using an unrivaled set of best practices and custom peer groups.

Finally, we deliver a custom analysis that serves as a roadmap to capture improvement opportunities and monitor progress against a clear set of realistic targets.

Solomon assessed the $CO_2e$ emissions for more than 85% of worldwide refining capacity in our last study using CEI.

**Trusted Industry Advisor for Regulatory and Compliance Issues**

Solomon has a long history of working with its study participants and their respective industry associations to address regulatory and other governmental challenges. Recent contributions have been made in Europe, Canada, Japan, Singapore, New Zealand, and the United States.

**The Result**

Our GHG consulting services can identify your potential inefficiencies and show you specific changes to drive improvement and achieve your business objectives.

**Different Business Issues Need Different Approaches**

Solomon has two primary GHG metrics:

Carbon Emissions Index (CEI™) is Solomon's patented benchmarking metric for optimization and performance improvement within an industrial facility. This rigorous, accurate, and reliable metric is used to assess $CO_2e$ emissions efficiency performance relative to the industry, set targets for managing this critical area of performance, and to monitor your progress.

Complexity-Weighted Barrels (CWB™) is Solomon's benchmarking metric designed specifically for use in developing global GHG intensity metrics and allocation methodologies to help Solomon's study participants address regulatory and other governmental challenges.

A version of Solomon's CWB metric, Complexity-Weighted Tonnes (CWT) was selected by the European refining industry as they comply with the EU Emissions Trading Scheme (ETS) Directive adopted in December 2008.

The examining attorney argues that applicant's brochure discusses applicant's "technical consultation services but the specimen does not use the term 'CEI' in

5

the context of providing consultation services." Br. p. 6.
The examining attorney continues that "[w]hile the specimen
states that the consulting services offered by Applicant
take Carbon Emissions Index measurements into account, at
no point in the brochure is it mentioned that 'CEI' refers
to the consulting service itself, rather than the clearly
proprietary standard developed by the applicant." Br. p.
6. The examining attorney maintains that the substitute
specimen suffers from the same failure in that:

> [CEI is only used] to describe the metric used
> for benchmarking that may or may not be a
> component factor in a larger consulting services,
> but at no point do the specimens use the term CEI
> to refer to the consulting services themselves.
> Consumers exposed to the use of the mark CEI on
> the specimens of record will view it as a
> standard for use in performing the consulting
> services but not as the source for the services
> themselves. ... Just because the term "CEI" is
> used to refer to a metric that may be analyzed in
> order to provide more informed consulting advice
> does not mean that consumers would recognize
> "CEI" is providing consulting services.

Br. p. 8.

> In response to the refusal applicant asserts that:
>
> The Specimen clearly shows that CEI is a
> benchmarking/consulting service that is used in
> connection with Applicant's GHG [greenhouse gas]
> consulting services. The Specimen indicates that
> Applicant uses CEI to help its customers (i)
> assess $CO_2e$ emissions efficiency performance
> relative to the industry; (ii) set targets for
> critical area of performance, and (iii) monitor
> their progress. Specimen, p.2. As such,
> customers would regard CEI not as a simple

measurement, but instead as a consulting service whereby, e.g., Applicant measures a customer's $CO_2e$ emissions, assesses the measured emissions by comparing it to Applicant's proprietary data collected from many other facilities worldwide, advises the customer on areas in need of improvement, and monitors the customer's progress by repeating the process. ... Moreover, assuming arguendo that CEI "is a process of measuring something ...," that very "process of measuring" is an aspect of the applied-for services, i.e., "technical consultation in the field of hydrocarbon and chemical processing, pipeline, and power industries" in International Class 042.

Br. pp. 4-5.

Applicant contends that its technical consulting services:

... include, but are not limited to, collecting data from an industrial facility so that it may be benchmarked against other industrial facilities. In the case of CEI, such services include but are not limited to consultation services to assess an industrial facility's $CO_2e$ emissions efficiency performance, benchmarking the same against other industrial facilities, setting targets for industrial facilities, and providing services to assist the consumers to better manage performance over time.

Br. pp. 5-6.

In this regard, applicant asserts that:

... if applicant uses CEI in connection with an "aspect" of the consulting services, it is without question that it uses the mark in connection with the services. Similarly, if Applicant uses CEI in connection with benchmarking that it provides as part of the consulting services, then the mark is being provided in connection with the services.

Reply Br. p. 2.

In addition, applicant argues that its consumers "are sophisticated and are well aware that Applicant is a world renowned company that is in business exclusively to provide technical consultation services in the field of hydrocarbon and chemical processing, pipeline, and power industries." Br. p. 5. In connection with this argument, in its brief, applicant references websites describing its services. In his brief, the examining attorney objected to these references because, although applicant first made reference to these websites in its Request for Reconsideration, that request was not accompanied by dated printouts or screenshots of the websites.

The asserted sophistication of applicant's consumers is largely inapposite to the issue of whether applicant's specimens show the applied-for mark used in connection with the services. Nonetheless, to be complete in our consideration of applicant's appeal, we have considered applicant's argument that because the examining attorney did not "make any mention of the need for dated printouts or screenshots" in the denial of the Request for Reconsideration, the examining attorney lost the opportunity to make the objection now asserted in his brief.

8

It is correct that if an examining attorney does not object to a listing of third-party registrations, proffered in response to an Office Action, as being insufficient to make the third-party registrations of record, any later objection to the list would be waived.  In re Dist. of Columbia, 101 USPQ2d 1588, 1592 n.5 (TTAB 2012).  However, the examining attorney's failure to advise applicant of the insufficiency of its references to website evidence in its Request for Reconsideration is not viewed as a waiver, because there was no subsequent opportunity for applicant to cure the insufficiency.  In re 1st USA Realty Professionals Inc., 84 USPQ2d 1581, 1583 (TTAB 2007) (listing of third-party registrations submitted with Request for Reconsideration not considered because at the time it filed the list applicant no longer had an opportunity to add to the record of the application and correct the evidentiary insufficiency of the submission); see also Trademark Rule 2.142(d) and TMEP § 710.01(c).  Accordingly, the examining attorney's objection in his brief is timely and the right to make it was not previously waived.

Moreover, a reference to a website's internet address is not sufficient to make the content of that website or any pages from that website of record.  TMEP §710.01(b).

9

Dist. of Columbia, 101 USPQ2d at 1592 n.5. Thus, even if the objection were considered waived, only the website address itself would be of record and the Board would not utilize the address to access the site and consider whatever content appeared. As the Board has frequently noted, the evanescent nature of web content makes it particularly important that a copy of the relevant material be submitted in the record, otherwise, it is impossible to know what the examining attorney viewed while examining the application.

Further, the record must be complete prior to the filing of an appeal. Trademark Rule 2.142(d). Thus, the printouts attached to applicant's reply brief, in an attempt to address the objection made in the examining attorney's brief, are untimely.[1] In view thereof, neither the website references nor the printouts have been considered.[2]

Having fully considered applicant's argument on this point, we turn back to the refusal of registration. The

---

[1] After a request for reconsideration has been filed and denied, an applicant may only seek to introduce evidence by requesting suspension of the appeal and remand to the examining attorney. The Board's decision to grant or deny such a request depends on the applicant's showing of cause therefor. See TBMP § 1207.02.

[2] We add that even if we were to consider the untimely evidence it would not change the result herein.

case of Universal Oil, 177 USPQ at 457, is instructive for our determination.  In that case, the applicant sought to register PACOL for, *inter alia*, "research, development, evaluation, market and economic studies, consultation, design, engineering and technical services in connection with a process for the dehydrogenation of normal paraffins" and PENEX for "research, development, evaluation, market and economic studies, consultation, design engineering and technical services for others in connection with an isomerization process."  In circumstances similar to the present case, the Federal Circuit's predecessor court affirmed the Board's refusal to register the marks PACOL and PENEX even though the words PACOL and PENEX appeared in the applicant's brochure for its services as the name of processes.  The Court reasoned that:

> ...The requirement [of the Statute] that a mark must be "used in the sale or advertising of services" to be registered as a service mark is clear and specific.  We think it is not met by evidence which only shows use of the mark as the name of a process and that the company is in the business of rendering services generally, even though the advertising of the services appears in the same brochure in which the name of the process is used.  The minimum requirement is some direct association between the offer of services and the mark sought to be registered therefor.

Id.

11

Similarly, upon review of the specimens of use, we find that CEI, an initialism for a "carbon emissions index," is only used to identify applicant's process by which applicant derives a particular measurement. In each instance CEI is identified as a metric, an index, an equivalency factor, a standard, a performance measure, but never as a technical consulting service. There is no direct association between applicant's offer of the applied-for services and the term CEI. In view thereof, as used in the specimens of record CEI serves only to identify a process but not the applied-for services and hence is not registrable. The fact that the CEI process, measurement, metric, benchmark or standard may be used by applicant in the performance of its technical consulting service does not transform that metric into a technical consulting service or associate the term CEI with the technical consulting service such that it serves as a source identifier rather than simply the name of a process.

**Decision**: The refusal to register under Sections 1 and 45 of the Trademark Act is affirmed.